**John PFEFFER, Respondent,**

v.

**STATE AUTOMOBILE AND CASUALTY UNDERWRITERS INSURANCE COMPANY, Appellant.**

**No. 49716.**

Supreme Court of Minnesota.

April 25, 1980.

---

Barnett, Ratelle, Hennessy, Vander Vort, Stasel & Herzog and W. Scott Herzog, Minneapolis, for appellant.

Joseph W. Parris and Donald W. Fett, Hector, for respondent.

Heard before ROGOSHESKE, KELLY and TODD, JJ., and considered and decided by the court en banc.

KELLY, Justice.

After a trial in an action for a declaratory judgment between State Automobile and Casualty Underwriters Insurance Company, a no-fault insurer, and John Pfeffer, its insured, the trial court held that State Auto, which had already paid out benefits to Pfeffer, had no subrogation rights to the proceeds received by Pfeffer in a settlement with a third-party tortfeasor where the total amount that Pfeffer received from all sources would not completely compensate him for his injuries. Judgment was entered in accordance with this holding, and State Auto appeals from that judgment. We affirm.

The plaintiff/respondent John Pfeffer was a passenger in a car driven on a highway near Sleepy Eye by Joseph Fernkes on December 4, 1975. Also riding in Fernkes' car was one Timothy Ruskamp. Fernkes' car hit an icy patch and skidded into the left lane where it collided with a vehicle driven by one Ira Rutherford, an agent for American Milk Producers, Inc. (AMPI). Ruskamp was killed in the accident, and Pfeffer sustained severe injuries, especially to his right arm. As partial compensation for his injuries, Pfeffer received $30,000 in benefits from his insurer, State Automobile and Casualty Underwriters Insurance Company, under a no-fault policy issued pursuant to chapter 65B of the Minnesota Statutes. The money was apportioned $20,000 for medical expenses and $10,000 for wage loss, and it represented the limits of the policy.

Since it was allowed by law, Pfeffer brought suit against Fernkes, Rutherford, and AMPI, alleging negligence and seeking to recover damages.[1] Subsequently, State Auto informed both Rutherford and Fernkes' insurer, Iowa Mutual Insurance Company, by letters that it was claiming a $30,000 subrogation right in any proceeds

---

1. A similar case had been brought under the wrongful death statute by the next of kin of the other passenger in Fernkes' car, Timothy Ruskamp. In that case, at the trial level, AMPI and Rutherford were directed out by the judge at the close of testimony, and the jury brought in a finding of no causal negligence on the part

of Fernkes. Thus, the plaintiff received nothing. Ruskamp's next of kin appealed, and this court affirmed, ruling that the jury could reasonably have found Fernkes nonnegligent under the circumstances. *Ruskamp v. Fernkes*, 261 N.W.2d 612 (Minn.1978).

that Pfeffer might recover from them. The case then went to trial. Even though agents for State Auto apparently knew of the lawsuit, State Auto did not attempt to intervene as a party to protect its claimed subrogation right.

During the trial, while the trial judge was considering a pending motion by AMPI for a directed verdict, the three parties to the lawsuit settled the case. In settlement, the two defendants agreed to pay Pfeffer a total of $57,500 for a general release, Fernkes contributing $50,000, or the limits of his liability policy, and AMPI contributing $7,500. The lawyer for Fernkes, however, obviously desired to protect his client with regard to the alleged subrogation claim by State Auto.[2] Thus, Fernkes' insurer, Iowa Mutual, issued its payment in two drafts, draft one for $20,000 to John Pfeffer and Joseph Parris his attorney; and draft two for $30,000 to State Auto "and Joseph Parris their attorney."

Draft two was originally issued only to State Auto without Parris' name appearing thereon. However, the attorney for Fernkes and Iowa Mutual, on his own, returned the check to the company asking that attorney Parris' name be added. He did this because of his apprehension that Parris might have some claim to attorneys' fees from the portion of the settlement apparently intended to satisfy State Auto's alleged subrogation claim. After Parris' name had been inserted on the $30,000 draft, it was then apparently delivered to Parris, who forwarded it to State Auto for its endorsement. State Auto returned the draft to Iowa Mutual demanding that the draft be re-issued without Parris being listed as one of the payees. Iowa Mutual refused, and returned the draft to Parris.

Pfeffer then brought this declaratory judgment action, asking for a legal determination that State Auto had no statutory subrogation right in the settlement with Fernkes and AMPI until Pfeffer had been fully compensated, and that therefore State Auto was not entitled to the $30,000. Pfeffer also contended that, if State Auto *did* have a subrogation right, he was entitled to reasonable compensation for fees and expenses incurred in collecting the subrogated amount for State Auto.

After a court trial, the district court ruled that the overriding purposes of the no-fault law were to provide for relief for uncompensated victims of automobile accidents and to prevent double recovery. Thus, he reasoned, the statutory subrogation right of a no-fault insurer (who has paid out benefits) to the settlement proceeds recovered by its insured from a third-party tortfeasor was not meant to apply unless and until the insured was fully compensated for his injuries; or, in other words, the subrogation right was only meant to apply to prevent double recovery by the insured. The trial court found as a fact that compensation for Pfeffer's injuries would require at least $100,000.[3] Since the total of the settlement and no-fault proceeds was only $87,500, subrogation was not required to prevent double recovery. Therefore, State Auto's claim to $30,000 of the settlement was denied.

The issue presented on appeal is: Does State Auto have a subrogation right, to the extent of the no-fault benefits paid, in any proceeds of the settlement reached by John Pfeffer, Joseph Fernkes and AMPI?[4]

**2.** It is clear that all parties were cognizant of State Auto's claim. At one point during the settlement negotiations, Pfeffer's attorney attempted by phone to get State Auto to lower its alleged subrogation claim in furtherance of a settlement. However, State Auto refused to compromise its claim. Fernkes' attorney definitely testified that his purpose in settling for the limits of Fernkes' liability policy was to protect his client from any overage, and that he intended the settlement to satisfy all claims including State Auto's.

**3.** Appellant's counsel stipulated at oral argument that a conservative evaluation of full compensation for plaintiff's injuries would be $125,000.

**4.** Since we rule in favor of respondent that State Auto has no subrogation right in the settlement proceeds, we need not address the other question raised by the parties, whether, if State Auto does have such a right, reasonable attorneys' fees and expenses for collecting the

In 1974, the Minnesota Legislature enacted the Minnesota No-Fault Automobile Insurance Act. The basic reason for enactment was to modify some of the alleged inequities of the then totally fault-based reparations system for personal injuries occurring in motor vehicle accidents, by requiring drivers to have insurance policies that provide compensation for certain of such injuries regardless of fault. The purposes of the Act are explained in Minn.Stat. § 65B.42 (1978), and they include encouraging promptness of payment for medical treatment, prevention of overcompensation for minor injuries, and relief of the economic distress of uncompensated victims.

Even though an injured party has secured no-fault benefits under his insurance policy, he may nonetheless bring an action in tort for economic loss if, due to policy limits or exclusions, he is not adequately compensated. Minn.Stat. § 65B.51, subd. 2 (1978). He may also bring an action for noneconomic detriment if the expenses attributable to his injuries rise above a certain level, or if his injury results in long disability, permanent disfigurement, or death. Minn.Stat. § 65B.51, subd. 3(2) (1978).

In addition, Minn.Stat. § 65B.53, subd. 2 (1974) (amended 1976) [5] provided the subrogation rights of the no-fault insurer in any recovery from a third party tortfeasor:

> To the extent permitted by section 65B.51, subdivision 1, a reparation obligor paying or obligated to pay basic or optional economic loss benefits shall be subrogated to the extent of benefits paid or payable to any cause of action to recover damages for economic loss which the person to whom the basic or optional economic loss benefits were paid or payable has brought under the terms of section 65B.51, subdivision 3 against another person whose negligence was the direct and proximate cause of the injury for which the basic economic loss benefits were paid or payable.

Minn.Stat. § 65B.51, subd. 1 (1974) (amended 1976), referred to in the statute above, provided that a no-fault insurer had no subrogation rights unless the insured had actually "commenced" a civil action for noneconomic detriment against a tortfeasor. Thus, if an injured insured settled a case with a third party tortfeasor merely by the threat of a suit without actually "commencing" it, the no-fault insurer clearly would have no subrogation rights.

Because in the present case the injured insured, John Pfeffer, had actually commenced a suit against Fernkes and AMPI, alleging causal negligence, it would superficially appear that State Auto should be "subrogated to the extent of benefits paid or payable to [his] cause of action" under Section 65B.53, subd. 2. If State Auto has an unconditional statutory subrogation right in this case, it would follow that State Auto should receive either $30,000, or $30,000 reduced by attorneys' fees and expenses, because that is what the parties apparently agreed that right was worth to achieve a settlement.

Pfeffer, however, argues, and the trial court held, that, under the facts of this case, State Auto never achieved any subrogation rights because, even with the combined proceeds of the settlement and the no-fault benefits, Pfeffer was not adequately compensated for his injuries. Plaintiff argues that the overriding purposes behind the No-Fault Act in general indicate that State Auto's rights under section 65B.53 subd. 2 are inchoate or conditional, not arising unless or until the insured is fully compensated. The case most relied on for this argument is *Milbank Mutual Insurance Co. v. Kluver*, 302 Minn. 310, 225 N.W.2d 230 (1974).

In *Milbank Mutual*, the defendant was involved in an automobile accident caused

settlement should be deducted from the amount of the proceeds apportioned to State Auto.

**5.** The cause of action in this case arose out of an accident that occurred on December 4, 1975.

The disposition of this case is thus controlled by the no-fault law as originally enacted in 1974 before the amendments of 1976 or subsequent amendments.

by the negligence of an uninsured motorist. She was paid a total of $26,300 by her insurer in compensation for her injuries based on the uninsured motorist, collision, and medical expenses coverages in her automobile insurance policy. Subsequently she commenced a dram shop action against the liquor store and bar that had allegedly been negligent in selling liquor to the uninsured motorist. She explicitly notified her insurer of the dram shop action, stating that she did not believe that the insurer had any subrogation rights. The defendant then settled with the two dram shop defendants for a total of $41,500. Her total damages were stipulated by the parties to be $70,000.

Defendant's uninsured-motorist insurer then brought suit for subrogation claiming that under Minn.Stat. § 65B.22 subd. 6 (1971) (repealed 1974),[6] it was entitled to recover the uninsured-motorist payments it had paid out to the defendant from the proceeds of the settlement with the third-party tortfeasor.

Starting from the premise that "[w]e should not construe the subrogation provision in subd. 6 as though it stood alone", we went on to consider the purpose of uninsured-motorist insurance in general. We concluded, "It would be absurd to permit defendant Kluver to recover double damages and it is just as absurd to permit subrogation in this case where she has not been fully compensated." Id. at 313, 225 N.W.2d at 232. If subrogation were permitted, we further reasoned, the defendant would be deprived of benefits for which she had paid a premium. Furthermore, she would be worse off than if the uninsured motorist had been insured.

Thus, even though section 65B.22, subd. 6 appeared on its face to provide unconditional subrogation for the insurer, we held "that an uninsured-motorist liability carrier does not have the right to be subrogated to the proceeds of a settlement its policyholder makes with liquor vendors allegedly liable under the Civil Damage Act for illegal sales to the uninsured motorist where the policyholder has not been fully compensated for her injuries." Id. at 315, 225 N.W.2d at 233.[7]

Many of the same reasons for the decision in Milbank Mutual also apply in this case. As the court below pointed out, two of the major purposes of the No-fault Act are "[t]o relieve the severe economic distress of uncompensated victims of automobile accidents within this state by requiring automobile insurers to offer and automobile owners to maintain automobile insurance policies or other pledges of indemnity which will provide prompt payment of specified basic economic loss benefits to victims of automobile accidents without regard to whose fault caused the accident;" Minn. Stat. 65B.42(1) (1978), and "to provide offsets to avoid duplicate recovery," Minn. Stat. § 65B.42(5) (emphasis added). Thus the major thrust of the Act would appear to be to promote full, but not over-, compensa-

6. Section 65B.22, subd. 6 provided:
In the event of payment to any person under the coverage required by this section and subject to the terms and conditions of such coverage, the insurer making such payment shall, to the extent thereof, be entitled to the proceeds of any settlement or judgment resulting from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury for which such payment is made, including the proceeds recoverable from the assets of the insolvent insurer.

7. As a counterpoint to Milbank Mutual, in Paine v. Water Works Supply Co., 269 N.W.2d 725 (Minn.1978), we allowed a workers' compensation insurer to be reimbursed, to the extent of benefits paid, out of a settlement by the employee's widow of a dram shop action relat-

ing to the same injuries for which workers' compensation benefits were paid, even though we were willing to assume that the widow had not been adequately compensated. We distinguished Milbank Mutual on the ground that it "was decided under the uninsured motorist statute in furtherance of full compensation of accident victims, which was uniquely the purpose of that statute," and thus it had no application to a workers' compensation case. Id. at 731. (Footnotes omitted.) Interestingly, we also noted that the uninsured motorist statute at issue in Milbank Mutual had since been "replaced" by the No-Fault Act. Id. at 731 n. 9. The current case is closer to Milbank Mutual than to Paine, in that the No-Fault law subsumes many of the general purposes of the uninsured motorist statutes.

tion for all motor vehicle related injuries. In addition, as in *Milbank Mutual*, to allow subrogation in this case would appear to deprive the no-fault policyholder of benefits for which he paid a premium.

State Auto, however, argues that legislative intent that the "full compensation" standard should not apply to pre-1976 cases is indicated by the Minnesota Legislature's specific treatment in the Act as it appeared in 1974 of subrogation for intentional tort and strict liability claims. The legislature specifically provided at the outset that the right of insurer subrogation on intentional tort or strict liability claims should exist "only to the extent that recovery on the claim[s] would produce a duplication of benefits or reimbursement of the same loss." Minn.Stat. § 65B.62 (1974) (current version at Minn.Stat. § 65B.53, subd. 3 (1978)). State Auto also contends that a 1976 amendment to section 65B.53, subd. 2, explicitly limiting the subrogation right of the no-fault insurer to out-of-state accidents and then only as necessary to prevent "duplication of benefits or reimbursement of the same loss," Act of Mar. 25, 1976, ch. 79, § 1, 1976 Minn.Laws 201, shows a legislative intent that the "duplicate benefits" limitations to subrogation should *not* be applied to the present action, which arose before the effective date of the amendment.

A similar situation faced the Georgia court in *Blaylock v. Georgia Mutual Insurance Co.*, 239 Ga. 462, 238 S.E.2d 105 (1977). In *Blaylock*, three persons were injured in an automobile accident, one fatally. The two nonfatally injured received $8,883.79 from their no-fault insurer in benefits. Later these two, and the heirs of the deceased, agreed to settle with the insurance company of the person whose negligence had caused the accident for his policy limits of $20,000; $17,500 to go to the two nonfatally injured, and $2,500 to go to the heirs of the deceased. The tortfeasor's liability insurer deposited the insurance proceeds into court and successfully interpleaded the no-fault insurer as well as the injured parties in order to determine the respective rights of the parties. The issue thus became whether the no-fault insurer was entitled to

$8,883.79 of the settlement proceeds in enforcement of its alleged subrogation right. The trial court found that the $20,000 was not adequate compensation for the injured parties but allowed subrogation anyway, reasoning that the statute clearly called for it. The Georgia Supreme Court reversed.

The statute interpreted by the court in *Blaylock* applied to pre-1976 causes of action. It reads in relevant part as follows with a 1976 amendment (not applicable to that case) in brackets:

> Insurers and self-insurers providing benefits without regard to fault * * * shall be subrogated to the rights of the person for whom benefits are provided, [only in the event that the person for whom benefits are provided has been completely compensated for all economic and noneconomic losses incurred as a result of the motor vehicle accident] * *.

Ga.Code Ann. § 56–3405b(d)(1) (quoted in *Blaylock*, 239 Ga. at 463–464, n. 1, 238 S.E.2d at 107 n. 1). Although the court agreed that the no-fault insurer had a right of subrogation under the unamended statute, it reasoned:

> [H]aving the right of subrogation does not necessarily establish priorities where the assets of the tortfeasor are inadequate to pay his liabilities. We must still determine who shall bear the loss where the tortfeasor's assets are insufficient to compensate both the injured party and the injured party's no-fault insurance carrier. In order to determine the legislative intent prior to the 1976 clarifying amendment, we must consider the whole act.

*Id.* at 465, 238 S.E.2d at 108. The court further ruled that a provision of the Georgia no-fault law providing for the stacking of uninsured-motorist and no-fault benefits up to full compensation for the injured party indicated a general legislative intent that a similar result should occur when the tortfeasor is actually insured, and thus disallowed subrogation. *Accord, Georgia Farm Mutual Insurance Co. v. Southeastern Fi-*

*delity Insurance Co.,* 144 Ga.App. 811, 242 S.E.2d 743 (1978). *See also Williams v. Gateway Insurance Co.,* 331 So.2d 301 (Fla. 1976); *Ohio Security Insurance Co. v. Drury,* 582 S.W.2d 64 (Ky.App.1979); *Moultrie v. North River Insurance Co.,* 272 S.C. 53, 249 S.E.2d 158 (1978); *Thiringer v. American Motors Insurance Co.,* 91 Wash.2d 215, 588 P.2d 191 (1978).

As the general purposes behind the pre-1976 Georgia No-Fault Law in *Blaylock* were sufficient to overcome any contrary inferences arising from the subsequent amendment of the subrogation statute, the general purposes behind the pre-1976 Minnesota No-Fault Law applicable to this case, we believe, are sufficient to overcome any adverse inferences arising from reference to the amendment of the general subrogation statute—section 65B.53, subd. 2—or to the specific reference to "duplicate benefits" contained in the subrogation statute relating to intentional torts. As in *Blaylock* and *Milbank Mutual,* consideration must be given to the whole act to divine the intentions of the legislature. We therefore hold that a no-fault insurer is not entitled to subrogation under Minn.Stat. § 65B.53, subd. 2 (1974) (amended 1976) to the proceeds in a settlement, made by its insured with a third party tortfeasor, where the insured has not been fully compensated for his injury. Since the defendant in this case has stipulated that plaintiff's injuries were conservatively valued at $125,000, *see* note 3 *supra,* and plaintiff will receive a total of only $87,500 in combined proceeds, it is clear that plaintiff has not been fully compensated. The trial court is accordingly affirmed in all respects.

Affirmed.